Filed 7/25/23  P. v. Ramirez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS ALBERTO RAMIREZ,<br><br>    Defendant and Appellant. | G061178<br><br>(Super. Ct. No. 07WF2103)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Affirmed.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric Swenson and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

A complete recitation of this case's unusual procedural history can be found in our prior nonpublished opinion, *L.R. v. Superior Court* (July 6, 2021, G059599) (*L.R.*). Suffice it to say, after two sentencing hearings and four opinions from this court,[1] we must decide whether the trial court abused its discretion by sentencing Luis Alberto Ramirez to life in prison for crimes he committed while he was a juvenile, but for which he was tried as an adult. The trial court's sentencing decision was not arbitrary or capricious. We affirm the judgment.

## FACTS[2]

### I. Substantive Facts

Around midnight one summer evening in 2007, Ramirez and Jose Armendariz, who were both 16 years old,[3] Luis Menchaca, and Diane Estrada walked on a freeway overpass. Ramirez, Armendariz, and Menchaca were members of the Down Crowd street gang. (*Ramirez I, supra,* G044703.)

Menchaca saw a man and a woman, Oliver Martinez and Michelle Miller, walking onto the overpass behind them. Menchaca pretended to tie his shoe while his confederates waited so Martinez and Miller would pass them. As they passed, Menchaca recognized Martinez as a member of the rival Crow Village street gang. After the couple passed, Menchaca decided to "'hit up'" Martinez. (*Ramirez I, supra,* G044703.)

Menchaca asked Martinez if he had a lighter. Martinez replied, "'Aren't you that pussy from dick cravers?'" which was a derogatory term for Down Crowd. Menchaca said, "'Fuck Crow.'" (*Ramirez I, supra,* G044703.)

---

[1]     *L.R., supra,* G059599; *People v. Ramirez* (2019) 35 Cal.App.5th 55; *People v. Ramirez and Armendariz* (Aug. 27, 2014, G044703) [nonpub. opn.] (*Ramirez I*); *People v. Ramirez and Armendariz* (2013) 219 Cal.App.4th 655, review granted Dec. 18, 2013, S214133.

[2]     The facts are taken from our prior opinion, *Ramirez I, supra,* G044703.

[3]     Ramirez turned 16 years old 25 days before the offenses.

Ramirez pulled out a handgun and shot Martinez, shot Miller, and shot Martinez a few more times. Martinez and Miller died. (*Ramirez I, supra,* G044703.)

Ramirez, Menchaca, Armendariz, and Estrada ran back across the overpass—Estrada called a friend to pick them up. Menchaca told Ramirez to give him the expended rounds, and he dug a hole in the dirt and buried them. Ramirez reloaded the gun and gave it to Armendariz. They continued walking while they waited for the friend to arrive. The police arrived first. Armendariz hid the gun, and Ramirez threw a pair of gloves. Police officers detained Ramirez and Estrada. Menchaca and Armendariz fled, but police officers apprehended them. (*Ramirez I, supra,* G044703.)

A police officer found the gun and the gloves. Forensic testing revealed Ramirez's DNA was on the gun and gloves, and he had gunshot residue on his right hand. (*Ramirez I, supra,* G044703.)

Ramirez admitted to officers he was a member of Down Crowd but denied knowing Armendariz or Menchaca or being involved in the shooting. Menchaca told officers he was a member of Down Crowd and eventually recounted the gang confrontation and Ramirez's shooting Martinez and Miller. Armendariz corroborated Menchaca's account. (*L.R., supra,* G059599.)

II. *Procedural Facts*

At trial, the prosecution's theory was Ramirez was the actual shooter and Armendariz aided and abetted the murders. Ramirez was convicted of first degree murder of Martinez, second degree murder of Miller, and active participation in a criminal street gang. The jury found true age, gang, and firearm allegations. In January 2011, the trial court sentenced Ramirez to prison for life without the possibility of parole (LWOP) plus 65 years. (*L.R., supra,* G059599.)

After we affirmed Ramirez's convictions, reversed his sentence, and remanded for resentencing, the California Supreme Court granted review and remanded the matter to reconsider the decision in light of *People v. Gutierrez* (2014) 58 Cal.4th

3

1354 (*Gutierrez*). (*Ramirez I, supra,* G044703.) On remand, we affirmed his convictions but reversed his sentence and remanded the matter to the trial court to resentence Ramirez in light of *Gutierrez, supra,* 58 Cal.4th 1354. (*Ramirez I, supra,* G044703.)

The trial court continued the resentencing numerous times over the next two years. Before the court resentenced Ramirez, California voters passed Proposition 57, which changed the law regarding prosecution of minors in adult court. (Prop. 57, as approved by voters, Gen. Elec. (Nov. 8, 2016).) The court granted Ramirez's request to transfer the case to the juvenile court but stayed the transfer. (*L.R., supra,* G059599.)

The Orange County District Attorney (OCDA) appealed.[4] In *People v. Ramirez* (2019) 35 Cal.App.5th 55, 67-68, this court concluded the trial court properly transferred the matter to the juvenile court to conduct a transfer hearing.

On remand, the juvenile court determined the matter should be transferred to adult court. We denied Ramirez's petition for writ of mandate. (*L.R., supra,* G059599.)

Over 10 years after his first sentencing hearing, the matter proceeded for resentencing. Ramirez filed sentencing briefs supported by numerous exhibits, including Dr. Martha L. Rogers's psychological evaluation, the Orange County Probation Department's (OCPD) Welfare and Institutions Code section 707 report (prepared by probation officer Pablo Yepez), certificates, and letters.[5] As relevant here, Yepez's report detailed Ramirez's custodial conduct, including 18 behavior notices, 11 incident reports, and two rule violation reports.[6] The report also detailed a 2012 incident where Ramirez advanced toward correctional officers during a mass gang disturbance and a 2019

---

[4] The OCDA also filed a writ, which is unimportant here but is discussed in *L.R., supra,* G059599.

[5] We discussed Rogers's and Yepez's reports at length in *L.R., supra,* G059599.

[6] We detail Ramirez's custodial conduct in *L.R., supra,* G059599.

4

incident where Ramirez ran toward correctional officers and grabbed an officer's hand. Yepez and Rogers both reported Ramirez declined to participate in custodial programming because of "'prison politics.'" (*L.R., supra,* G059599.)

The prosecution filed sentencing briefs supported by numerous exhibits, including our prior opinion in *L.R., supra,* G059599, police reports regarding two uncharged crimes that were admitted at Ramirez's trial, Menchaca's testimony regarding those uncharged crimes, and his custodial records.

At the hearing, the trial court stated it had read and considered the parties' motions, voluminous exhibits, and the prior opinions from this court. The parties submitted on the written materials. The court explained that before imposing a life sentence on a juvenile, the sentencing court must determine whether the defendant was the rare juvenile who was irreparably corrupt. (*Miller v. Alabama* (2012) 567 U.S. 460, 479-480 (*Miller*).)

The trial court recited the five factors from *Gutierrez, supra,* 58 Cal.4th 1354 that it must consider before imposing LWOP, which we discuss below. The court noted that since our decision in *Ramirez I, supra,* G044703, the Legislature provided for a youth offender parole hearing after 25 years. The court recited the parties' arguments regarding each factor. The court inquired of the prosecution whether it intended to dismiss the gang and firearm allegations based on recent legislation. The prosecutor agreed. The court confirmed with counsel it was proceeding with sentencing on counts 1 and 2, and the multiple murder allegation.

The trial court stated it understood it had the discretion to strike the multiple murder special circumstance, sentence on count 1 or count 2, and to sentence consecutively or concurrently. The court recited the various factors to consider when imposing sentence. As to count 1, the court sentenced Ramirez to 25 years plus life without the possibility of parole for the Penal Code section 190.2, subdivision (a)(3), special circumstance. The court imposed a consecutive term of 15 years to life on count

5

2. The court stated, "The court does fashions [*sic*] this sentence recognizing that [Ramirez] will have numerous opportunities, irrespective of a life-without-possibility-of-parole sentence, to discuss this with the parole board." The court explained it imposed LWOP because of the "cruel, vicious murder of two individuals for absolutely no justification," and Ramirez's custodial behavior.

After a brief off-the-record discussion between Ramirez's counsel and the prosecutor, Ramirez's counsel requested the court impose 40 years to life. The court declined counsel's request and imposed sentence as indicated.

DISCUSSION

Ramirez argues the trial court abused its discretion by imposing LWOP on count 1 because the record failed to demonstrate he was the rare juvenile offender who was irreparably corrupt. We disagree.

In *Miller, supra,* 567 U.S. at page 479, the Supreme Court of the United States ruled, "[T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." However, a state may authorize its courts to impose LWOP on a juvenile homicide offender when the sentence is discretionary and when the sentencing court properly exercises its discretion. (*Id.* at pp. 477-480 ["""rare juvenile offender whose crime reflects irreparable corruption"""]; *Gutierrez, supra,* 58 Cal.4th at p. 1379.) The Court discussed a range of factors relevant to a sentencing court's determination whether a defendant is a "'rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller, supra,* 567 U.S. at pp. 479-480; *Montgomery v. Louisiana* (2016) 577 U.S. 190, 208 [LWOP unconstitutional for juvenile homicide offender "whose crimes reflect the transient immaturity of youth"].)

In *Gutierrez,* our Supreme Court interpreted *Miller* to require sentencing courts to admit and consider relevant evidence of five factors. "First, a court must consider a juvenile offender's 'chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences.'" (*Gutierrez,*

6

*supra,* 58 Cal.4th at p. 1388 [adolescence marked by "'transient rashness, proclivity for risk, and inability to assess consequences'"].) "Second, a sentencing court must consider any evidence or other information in the record regarding 'the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional.'" (*Id.* at pp. 1388-1389.) "Third, a court must consider any evidence or other information in the record regarding 'the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him.'" (*Id.* at p. 1389.) "Fourth, a court must consider any evidence or other information in the record as to whether the offender 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys.'" (*Ibid.*) "Finally, a sentencing court must consider any evidence or other information in the record bearing on 'the possibility of rehabilitation.'" (*Ibid.*)

"[T]he trial court must consider all relevant evidence bearing on the 'distinctive attributes of youth' . . . and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.'" (*Gutierrez, supra,* 58 Cal.4th at p. 1390.) However, the sentencing court is not required to make any specific finding regarding a juvenile's incorrigibility. (*Jones v. Mississippi* (2021) ___ U.S. ___ [141 S.Ct. 1307, 1313] (*Jones*).)

We review the trial court's sentencing choices for abuse of discretion. (*Gutierrez, supra,* 58 Cal.4th at p. 1391; *People v. Blackwell* (2016) 3 Cal.App.5th 166, 199 (*Blackwell*).) "A court's exercise of discretion will not be disturbed on appeal absent a showing that the court acted in an arbitrary, capricious, or patently absurd way, resulting in a manifest miscarriage of justice. [Citation.] 'In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, "'[t]he burden is on the

7

party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" [Citation.] Second, a "'decision will not be reversed merely because reasonable people might disagree. "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge."'" [Citation.]" (*Blackwell, supra,* 3 Cal.App.5th at p. 200.)

Ramirez acknowledges the trial court recited the parties' arguments regarding each *Gutierrez* factor but failed to articulate its reasoning. He asserts the court placed too great a significance on the crime, factor three, without affording appropriate significance to the other factors, although he only addresses factor one, age, and factor five, other evidence. He contends a proper application of the relevant evidence to the factors establishes LWOP was improper. In fact, he claims a proper analysis of factor three, the crime, "militates against an LWOP sentence."

In other words, what Ramirez requests we do is reweigh the relevant evidence against the factors and substitute our judgment for the sentencing court's judgment. Ramirez's appellate counsel knows we cannot do that. (*Blackwell, supra,* 3 Cal.App.5th at p. 200.) Appellate counsel also knows it is appellant's burden to establish reversible error, i.e., no reasonable person could agree with the trial court's sentencing decision. (Cal. Const., art. VI, § 13.)

Ramirez has not satisfied his burden. By discussing only three of the *Gutierrez* factors, he effectively concedes the other two were inapplicable. (*Gutierrez, supra,* 58 Cal.4th at p. 1390 [not all factors will be relevant in every case].) Truth be told, factor two, Ramirez's family and home environment, includes evidence from which one could reasonably conclude his family tried to steer the highly intelligent Ramirez

8

away from gangs, but he was infatuated by the gang lifestyle and defied his family. (*L.R., supra,* G059599.)

The record reflects the trial court considered each of the factors the *Miller* and *Gutierrez* courts deemed relevant to a sentencing court's determination of whether a particular defendant is a "'rare juvenile offender whose crime reflects irreparable corruption.'" (*Miller, supra,* 567 U.S. at pp. 479-480; *Gutierrez, supra,* 58 Cal.4th at p. 1388.) The court stated it had read and considered the voluminous written submissions and recited with specificity the parties' arguments regarding each of the five factors. The court reasoned Ramirez viciously and unjustifiably murdered two people. The evidence supports the court's conclusion.

Ramirez shot Martinez once, he shot Miller once, and he continued the senseless violence and shot Martinez a few more times. He reloaded the gun and gave it to a fellow gang member. When police arrived, he tried to discard incriminating evidence. Ramirez was mature beyond his 16 years.

We agree with Ramirez it appears the trial court accorded significant weight on the severity of his crimes. However, the fact the court concluded this factor deserved greater consideration was not an abuse of discretion. No particular factor is dispositive. (*Blackwell, supra,* 3 Cal.App.5th at p. 200.) As long as the court considers all the factors, which it did here, it is within the court's discretion to "'give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case.'" (*Ibid*.) Ramirez's claim that this factor weighs against an LWOP sentence because he was acting under peer pressure is an invitation for this court to reweigh the factors. We can't. That the court did not acknowledge these facts when ruling is of no import. The court was acutely aware of these facts and considered them. Indeed, the court recited Ramirez's argument that Menchaca influenced him and it was "a classic example of youth succumbing to peer pressure."

9

The trial court also placed significant weight on Ramirez's custodial behavior. As we explained in *L.R., supra,* G059599, Ramirez's custodial misconduct was not minimal. He had numerous rule violations and two incidents where he displayed aggressive conduct toward correctional officers. During one of those incidents, he grabbed an officer. The record includes other instances of gang related and unruly conduct. And he declined to participate in various programs because of prison politics. The court reasonably relied on this evidence to conclude his chances at rehabilitation were slight.

Ramirez minimizes his wrongdoing, challenges the trial court's characterization of his violent conduct, and draws positive inferences from the reports. Again, we cannot reweigh the relevant evidence against the factors. The court's comments establish the court was aware of and considered Ramirez's custodial conduct. This is all the court was required to do. It was entitled to draw its own conclusions. Ramirez has not satisfied his burden to establish those conclusions were arbitrary or capricious. The record demonstrates the court was fully aware of its discretion as it weighed the relevant evidence against the factors and concluded Ramirez was the rare juvenile offender who is irreparably corrupt and deserved LWOP.[7]

Ramirez complains the trial court improperly considered Penal Code section 3051 in selecting LWOP. Penal Code section 3051 provides that an offender who committed a controlling offense as a youth is entitled to a youth offender parole hearing after a fixed period of years set by statute, here 25 years. Although the court did say it "fashion[ed] [the] sentence recognizing" he was entitled to a youth offender parole hearing, Ramirez makes too much of the court's comment. We agree with the Attorney

---

[7] In his reply brief, Ramirez stresses the trial court declined to find he was irreparably corrupt and permanently incorrigible citing to *Jones, supra,* ___ U.S. ___ [141 S.Ct. 1307]. We do not read the record that way. The court was simply pointing out it was not required to make that finding before imposing LWOP.

General the court was merely pointing out that despite the LWOP sentence, there remained hope he would not spend the rest of his life in prison. The court made the comment after it discussed the factors and the parties' arguments, and imposed sentence. We do not read the court's comment as an abdication of its sentencing duty. The trial court's sentencing decision was not arbitrary, capricious, or patently absurd.

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOTOIKE, J.


DELANEY, J.

11